UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:20-CV-00583-GNS

ISCO INDUSTRIES, INC.                                    PLAINTIFF

v.

FEDERAL INSURANCE COMPANY                                DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss (DN 13) and Defendant's

Motion for Leave to File Supplemental Authority (DN 31).  The motions are ripe for adjudication.

For the reasons stated below, the motion to dismiss is **GRANTED**, and the motion for leave is

**DENIED**.

## I.    BACKGROUND

### A.    Statement of Facts

This insurance-coverage dispute between ISCO Industries, Inc. ("ISCO") and its fiduciary

liability insurer, Federal Insurance Company ("Federal"), arises out of a class-action lawsuit

alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA").  (Compl.

¶¶ 1, 2, DN 1).  Many of the pertinent facts are not disputed by the parties.

On January 25, 2017, Participants in the ISCO Employee Stock Ownership Plan ("ISCO

ESOP") filed a class-action lawsuit against Wilmington Trust, N.A. ("Wilmington Trust"), trustee

for the ISCO ESOP (the "Underlying Lawsuit").[1]  (Compl. ¶¶ 1-2, 20).  Pursuant to a provision in

---

[1] Participants in the ISCO Employee Stock Ownership Plan ("ISCO ESOP") filed the class-action
lawsuit in the United States District Court for the District of Delaware (the "Underlying Lawsuit").
(Compl. ¶¶ 1-2, 20).  They named Wilmington Trust, trustee for ISCO's ESOP, as the sole
defendant.  (Compl. ¶¶ 1-2, 20).  The Underlying Lawsuit asserted that on December 20, 2012,

the Trust Agreement between ISCO and Wilmington Trust, ISCO had a contractual obligation to indemnify Wilmington Trust in connection with the Underlying Lawsuit. (Compl. ¶¶ 1-2, 26-27).

On January 30, 2017, ISCO filed a claim for the Underlying Lawsuit with Federal under the insurance policy Federal issued to ISCO, Policy No. 8247-1426, effective March 19, 2016, to March 19, 2017 (the "Policy"). (Compl. ¶¶ 5, 28). On January 31, 2017, Federal sent ISCO a letter acknowledging ISCO's claim for coverage under the Policy and advising that Tracy Tkac ("Tkac") would be handling the matter on behalf of Federal. (Compl. ¶ 40).

On February 13, 2017, Tkac sent an email to ISCO's insurance broker that in part reads:

Originally, I did not think that there was coverage for the matter because it was a liability assumed under contract but there is a carve back on the exclusion where the indemnification arises out of the original formation of the ESOP.

You can let the insured know that the preliminary review of coverage is positive in terms of defending the matter.

[A] more formal letter should be forthcoming in the near future. In the meantime, Federal reserves all rights under the Policy and at law.

(Compl. ¶ 41 (alteration in original)). ISCO acknowledges that Federal did not send a more formal letter confirming coverage. (Compl. ¶ 42). ISCO, however, alleges that in multiple communications over the next two months Federal and its claim representative, Tkac, confirmed that coverage existed. (Compl. ¶¶ 6, 43-49). The Complaint asserts that in those multiple communications, "Federal never issued any communication to ISCO or its broker specifically identifying any particular coverage defenses or issues upon which [Federal] reserved the right to

---

ISCO sold four million shares of its common stock to the ISCO ESOP in exchange for a twenty-five year note in the amount of $98 million USD, accruing interest at a rate of 2.4 percent per annum (the "ESOP Transaction"). (Compl. ¶¶ 3, 22-24). The Underlying Lawsuit alleged that this transaction allowed ISCO to sell its common stock for an inflated price, to the detriment of the ISCO ESOP and its participants. (Compl. ¶¶ 4, 22-24). The Underlying Lawsuit claimed that Wilmington Trust, by approving this transaction in violation of ERISA, failed to fulfill its duties as the representative of the ISCO ESOP and its participants. (Compl. ¶¶ 4, 22-24).

deny coverage."  (Compl. ¶¶ 6, 43-49).  The Complaint also alleges that Federal proceeded to coordinate a defense for Wilmington Trust and reimburse its defense costs.  (Compl. ¶¶ 6, 48-49).

ISCO asserts, in reliance upon Federal's coverage representations, it re-purchased "certain shares of ISCO stock from the ISCO ESOP, which is reflected by the fact that the value of Federal's coverage for the Underlying Lawsuit was expressly factored into the pricing of that re-purchase transaction."  (Compl. ¶¶ 7, 49).  Additionally, ISCO "forgave certain obligations of the ESOP in reliance of Federal's representations that it would provide coverage for the Underlying Lawsuit."  (Compl. ¶¶ 7, 49).

According to ISCO, one year later, on March 28, 2018, Federal "abruptly reversed course" and announced in correspondence to ISCO that there was no coverage for the Underlying Lawsuit.  (Compl. ¶¶ 8, 50).  Federal indicated it would continue defending Wilmington Trust in the Underlying Lawsuit due to its previous admissions that coverage existed.  (Compl. ¶¶ 8, 51).

The parties in the Underlying Lawsuit then proceeded to mediation in May 2019.  (Compl. ¶¶ 9, 52).  Although Federal consented to Wilmington Trust's participation in the mediation, Federal reiterated that coverage for the Underlying Lawsuit did not exist under the Policy, but indicated it would continue to defend Wilmington Trust.  (Compl. ¶¶ 9, 53).  Wilmington Trust eventually settled the Underlying Lawsuit for $5 million and demanded that ISCO pay a portion of that settlement based on ISCO's contractual indemnity obligations to Wilmington Trust.  (Compl. ¶ 10).  The Complaint alleges that Federal refused ISCO's demand that Federal provide coverage for the full amount of ISCO's indemnity to Wilmington Trust, instead offering to pay only a small portion of the indemnity that Wilmington Trust sought from ISCO.  (Compl. ¶ 10).

B.      **Procedural History**

On August 19, 2020, ISCO filed this lawsuit asserting claims of estoppel; waiver; breach of contract; bad faith in violation of the Kentucky Unfair Claims Settlement Practices Act ("KUSCPA"), KRS 304.12-230(1), (6), and (7); and bad faith under Kentucky common law. (Compl. ¶¶ 56-65, 66-74, 75-84, 85-94, 95-102).   On November 18, 2020, Federal moved under Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint for failure to state a claim upon which relief can be granted.  (Def.'s Mot. Dismiss 1, DN 13).  ISCO responded (Pl.'s Resp. Def.'s Mot. Dismiss, DN 23 [hereinafter Pl.'s Resp.]), and Federal replied (Def.'s Reply Mot. Dismiss, DN 30 [hereinafter Def.'s Reply]).[2]

## II.      JURISDICTION

The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity between the two parties because ISCO is a Kentucky corporation with its principal place of business in Louisville, Kentucky, and Federal is an Indiana corporation with its principal place of business in Warren, New Jersey.  (Compl. ¶¶ 15-16).  Further, the amount in controversy as pleaded exceeds the $75,000.00 the jurisdictional minimum.  (Compl. ¶ 17).

---

[2] On September 23, 2021, Federal moved under Fed. R. Civ. P. 15(d) for leave to submit supplemental authority in support of its Rule 12(b)(6) motion to dismiss.  (Def.'s Mot. Suppl. 1, DN 31).  Essentially, Federal alerted the Court to a recent Fifth Circuit decision, *Martin Resource Management Corp. v. Federal Insurance Co.*, No. 20-40571, 2021 WL 4269565 (5th Cir. Sept. 20, 2021), as Federal believed it to be particularly persuasive authority in support of its dispositive motion.  (Def.'s Mot. Suppl. 3, DN 31).  ISCO responded (Pl.'s Mem. Resp. 1, DN 34), and Federal replied (Def.'s Mem. Reply 1, DN 30).  Federal's motion under Fed. R. Civ. P. 15(d) is misplaced because a Rule 12(b)(6) motion is not a pleading under Rule 7(a)(1)-(7), and this motion will be denied.   The Court will, however, consider the Fifth Circuit's opinion in *Martin Resource Management Corp.*, as well as its potential applicability, when reviewing the parties' arguments to the Rule 12(b)(6) motion to dismiss.

### III.     STANDARD OF REVIEW

#### A.     Dismissal Pursuant to Rule 12(b)(6)

To survive dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (citation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

When considering a defendant's motion to dismiss, the Court will "accept all the [plaintiff's] factual allegations as true and construe the complaint in the light most favorable to the [plaintiff]." *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005) (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (citation omitted). Thus, to survive a 12(b)(6) motion, "[the] complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Twombly*, 550

U.S. at 570).  Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### B.   Consideration of Documents Not Attached to the Complaint

Generally, courts may not consider matters outside the pleadings in reviewing a Rule 12(b)(6) motion to dismiss except when the motion is treated as a motion for summary judgment under Rule 56. *Stein v. HHGregg, Inc.*, 873 F.3d 523, 528 (6th Cir. 2017) (citing *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016)); *see* Fed. R. Civ. P. 12(d).  As the Sixth Circuit has noted:

> [A] court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment.

*Gavitt*, 835 F.3d at 640 (citations omitted).

The only pleading filed in this case is the Complaint.  *See* Fed. R. Civ. P. 7(a)(1)-(7). Although the Policy and certain correspondence are referred to and quoted verbatim throughout the Complaint, these documents are not attached to the Complaint.  (Compl. ¶¶ 1-102).  Instead, they appear in the record as exhibits in support of Federal's motion to dismiss.  (Def.'s Mot. Dismiss Exs. B to E, DN 13-4 to 13-7).  Because these documents are referred to in the Complaint and are central to the claims contained therein, they will be considered in conjunction with the Complaint. *See Gavitt*, 835 F.3d at 640.

## IV.   DISCUSSION

### A.   Coverage under the Policy (Count III)

The parties agree this coverage dispute is governed by Insuring Clause (A) and the definitions, which are within the Fiduciary Liability Coverage Part of the Policy.  (Def.'s Mem. Supp. Mot. Dismiss 5-6, 11-14, DN 13-2 [hereinafter Def.'s Mot.]; Pl.'s Resp. 16-24; Def.'s Mot. Dismiss Ex. E, at 25-29, DN 13-7).  Insuring Clause (A) and some definitions of the terms in

Insuring Clause (A) are set forth in Endorsement/Rider No. 8 (Fiduciary Liability Coverage

Enhancements Endorsement) issued to ISCO, effective March 19, 2016.  (Def.'s Mot. Dismiss Ex.

E, at 44-47, DN 13-7).[3]  Exclusion "(E) Assumed Liability Under Contract" ["Exclusion (E)"] and

the two exceptions are located in the Fiduciary Liability Coverage Part of the Policy.  (Def.'s Mot.

Dismiss Ex. E, at 30).

### 1.    *Applicable Law*

The parties agree that Kentucky substantive law governs the insurance coverage dispute

because Federal issued the Policy to ISCO, a Kentucky citizen seeking fiduciary liability

coverage.[4]  Under Kentucky law, the party seeking to establish coverage bears the burden of

establishing that the claim is covered under the policy.  *Secura Ins. Co. v. Gray Constr., Inc.*, 717

F. Supp. 2d 710, 714-15 (W.D. Ky. 2020), *modified on clarification* (July 12, 2010) (citing *N. Am.*

*Accident Ins. Co. v. White*, 80 S.W.2d 577, 578 (Ky. 1935)).  Interpretation and construction of an

insurance contract is a question of law for the Court.  *Ky. Emps Mut. Ins. v. Ellington*, 459 S.W.3d

876, 881 (Ky. 2015) (citation omitted); *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82

S.W.3d 869, 871 (Ky. 2002) (citations omitted).  The determination whether coverage exists

begins with interpreting the relevant insurance contract.  *Stone v. Ky. Farm Bureau Mut. Ins. Co.*,

---

[3] Endorsement No. 10, effective date of March 19, 2016, modified the Fiduciary Liability
Coverage Part of the Policy.  (Def.'s Mot. Dismiss Ex. E, at 54).  It states that "[i]n consideration
of the premium charged, it is agreed that the term **Sponsored Plan**, as defined in Section II,
Definitions, of this Coverage Part shall include the following:  IIsco [sic] Industries, Inc. Employee
Stock Ownership Plan."  (Def.'s Mot. Dismiss Ex. E, at 54).

[4] As mentioned above, the Court's jurisdiction in this case is premised on diversity of citizenship
under 28 U.S.C. § 1332(a)(1).  "A federal court sitting in diversity must apply the substantive law,
including choice of law rules, of the state in which it sits."  *Phelps v. McClellan*, 30 F.3d 658, 661
(6th Cir. 1994) (citations omitted).  Under Kentucky's choice of law principles, a contract is
interpreted according to the law of the state that has the most significant relationship to the
transaction and the parties.  *State Farm Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875,
878-79 (Ky. 2013) (citing *Lewis v. Am. Family Ins. Grp.*, 555 S.W.2d 579, 581-82 (Ky. 1977);
Restatement (Second) Conflict of Laws § 188(1) (1971)).

34 S.W.3d 809, 810-11 (Ky. App. 2000).  "The primary object in construing a contract . . . is to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002) (citations omitted).  The contract "must be construed as a whole, giving effect to all parts and every word in it if possible." *Id.* (citation omitted); *see also Sun Life Ins. Co. v. Taylor*, 56 S.W. 668, 668 (Ky. 1900) ("In construing a contract, the whole must be taken together, in order to determine the intention of the contracting parties.").  The intentions of the parties are discerned from the four corners of the contract.  *Cantrell Supply*, 94 S.W.3d at 384 (citations omitted).  When there is an absence of any ambiguities, the terms are enforced as written. *McMullin v. McMullin*, 338 S.W.3d 315, 320 (Ky. App. 2011) (citing *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky. 1954)).

The Kentucky Supreme Court has set forth two cardinal principles of insurance contract interpretation: "(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and, (2) exceptions and exclusions should be strictly construed to make insurance effective." *Ky. Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992) (citations omitted).  As the Kentucky Supreme Court has explained:

> The rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract.

*St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994); *see also Stone*, 34 S.W.3d at 811 ("[T]he terms should be interpreted in light of the usage and understanding of the average person."  (citation omitted)).

2.     *Insuring Clause (A)*[5]

Insuring Clause (A) in Endorsement/Rider No. 8 states:

(A)     The Company shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made against the **Insured**:

    (i)     during the **Policy Period**, or, if exercised, during the Extended Reporting Period if applicable, for a **Wrongful Act** by the **Insured**, or by any natural person for whose **Wrongful Acts** the **Insured** is legally liable; or

    (ii)     that is a **Pre-Claim Investigation** or **Benefit Claim Denial**, if, at the **Insured's** option, it is reported to the Company in writing during the **Policy Period**.

(Def.'s Mot. Dismiss Ex. E, at 44).[6]  Neither party disputes that Insuring Clause (A)(i) pertains to this coverage dispute and ISCO is the **Insured**.  The parties agree that the **Policy Period** (March 19, 2016 to March 19, 2017) requirement is satisfied.[7]

In pertinent part, the term **Loss** is defined as "the amount which any **Insured** becomes legally obligated to pay as a result of any **Claim**, including: . . . compensatory damages; . . . settlements; and . . . **Defense Costs** . . . ."[8]  (Def.'s Mot. Dismiss Ex. E, at 27).  **Claim** means a written demand or civil proceeding "against an **Insured** for a **Wrongful Act**."[9]  (Def.'s Mot. Dismiss Ex. E, at 45).  And **Wrongful Act** "means any actual or alleged:"

---

[5] Defined terms used herein will be set forth in bold type, as in the Policy.

[6] The Complaint quotes the version of Insuring Clause (A) in the Fiduciary Liability Coverage Part of the Policy instead of the version in Endorsement/Rider No. 8.  (*See* Compl. ¶ 29; Def.'s Mot. Dismiss Ex. E, at 25).  The language in both versions is identical.  (*Compare* Def.'s Mot. Dismiss Ex. E, at 25, *and* Def.'s Mot. Dismiss Ex. E, at 44).

[7] The Complaint indicates the Underlying Lawsuit was filed on January 25, 2017, and ISCO tendered the Underlying Lawsuit to Federal on January 30, 2017.  (Compl. ¶¶ 5, 20).

[8] Endorsement/Rider No. 8 amends the definition of **Loss** with two additional circumstances in which an **Insured** may become legally obligated to pay as a result of a **Claim**.  (Def.'s Mot. Dismiss Ex. E, at 46).  Neither circumstance is relevant to this coverage dispute.

[9] A "written demand" means "(1) monetary or non-monetary (including injunctive) relief; or (2) arbitration or mediation."  (Def.'s Mot. Dismiss Ex. E, at 45).  A "proceeding" means a civil action, "formal civil administrative or formal civil regulatory proceeding," or a "criminal proceeding." (Def.'s Mot. Dismiss Ex. E, at 45).

(A)     breach of the responsibilities, obligations or duties imposed by **ERISA** upon fiduciaries of the **Sponsored Plan** committed, attempted or allegedly committed or attempted by an **Insured** while acting in the **Insured's** capacity as a fiduciary;

(B)     negligent act, error or omission in the **Administration** of any **Plan** committed, attempted or allegedly committed or attempted by an **Insured**;

(C)     matter, other than as set forth in (A) or (B) above, claimed against an **Insured** solely by reason of the Insured's service as a fiduciary of any Sponsored Plan; or

(D)     act, error or omission committed, attempted or allegedly committed or attempted by an **Insured**, solely in such **Insured's** settlor capacity with respect to establishing, amending, terminating or funding a **Sponsored Plan**.

(Def.'s Mot. Dismiss Ex. E, at 47).

### 3.      *Coverage under Insuring Clause (A)*

A plain reading of Insuring Clause (A)(i) shows coverage is only available for a **Loss** (award, settlement, defense costs) on account of a **Claim** (demand or lawsuit) first made against the **Insured** (ISCO) during the **Policy Period** (March 19, 2016, to March 19, 2017) for a **Wrongful Act** (breach of fiduciary duty under ERISA) by the **Insured** (ISCO), or by any natural person for whose **Wrongful Acts** the **Insured** (ISCO) is legally liable.  *See also Martin Res. Mgmt. Corp.*, 2021 WL 4269565, at *4 ("A careful, plain reading of the Insurance Clause shows coverage is only available if a Fiduciary Claim is made against an Insured for a Wrongful Act by an Insured. The Demands, as they appear from Wilmington, are facially insufficient to trigger the Insuring Clause, which requires the assertion of a 'Fiduciary Claim . . . made against [Martin] . . . for a Wrongful Act committed . . . by [Martin.]'" (alteration in original)).

The Complaint alleges that the Underlying Lawsuit was brought against Wilmington Trust, the trustee of the ISCO ESOP, for breach of Wilmington Trust's fiduciary duty under ERISA. (Compl. ¶¶ 1-4, 20-38, 75-84).  According to the Complaint, this insurance coverage dispute concerns the obligations of Federal to indemnify ISCO for ISCO's contractual obligation to indemnify Wilmington Trust in connection with the settlement of the Underlying Lawsuit against

Wilmington Trust.  (Compl. ¶¶ 1-4, 20-38, 75-84).  The Complaint alleges that ISCO assumed this contractual obligation to indemnify Wilmington Trust under the Trust Agreement establishing the **Plan**.  (Compl. ¶ 27).  In sum, the allegations in the Complaint are facially insufficient to trigger Insuring Clause (A)(i) because the Underlying Lawsuit is not a **Claim** first made against an **Insured** (ISCO) for a **Wrongful Act** by an **Insured** (ISCO), or by any "natural person" for whose **Wrongful Acts** the **Insured** (ISCO) is legally liable.  This means Count III of the Complaint cannot survive a Rule 12(b)(6) motion as it fails to state a claim upon which relief can be granted.

To the extent the Complaint asserts "the Underlying Lawsuit constitutes a Claim first made during the Policy Period," ISCO is only partially correct.  (Compl. ¶ 31).  There is no dispute that the Underlying Lawsuit was filed during the Policy Period.  More importantly, however, the definition of **Claim** specifies the civil action be "against an **Insured** for a **Wrongful Act** . . . ." (Def.'s Mot. Dismiss Ex. E, at 45).  Moreover, Insuring Clause (A)(i) specifically relates to "a **Claim** first made against the **Insured** . . . ." (Def.'s Mot. Dismiss Ex. E, at 25).  But the Complaint alleges the Underlying Lawsuit was first made against Wilmington Trust, not the **Insured** (ISCO). (Compl. ¶¶ 2, 3).  Therefore, contrary to the Complaint's assertion, the Underlying Lawsuit does not constitute a **Claim** as defined by Insuring Clause (A)(i).

To the extent the Complaint alleges "the settlement of the Underlying Lawsuit constitutes a Loss on account of a Claim," ISCO is mistaken.  (Compl. ¶ 32).  In pertinent part, Insuring Clause (A)(i) covers "**Loss** on account of a **Claim** first made against the **Insured** . . . ."  (Def.'s Mot. Dismiss Ex. E, at 44).  While the definition of **Loss** includes settlements that result from a **Claim** (Def.'s Mot. Dismiss Ex. E, at 27), the definition of **Claim** requires the civil action be "against an **Insured** for a **Wrongful Act** . . . ."  (Def.'s Mot. Dismiss Ex. E, at 45).  As the Complaint alleges

the Underlying Lawsuit was brought against Wilmington Trust, not ISCO, the settlement cannot be a **Loss** and the Underlying Lawsuit is not a **Claim** under Insuring Clause (A)(i).

Further, Wilmington Trust's actions do not constitute a **Wrongful Act** under Insuring Clause (A)(i).  (Compl. ¶ 33).  The definition of **Wrongful Act** includes the limiting language "by an **Insured.**"  (Def.'s Mot. Dismiss Ex. E, at 47).  Because Wilmington Trust is not the **Insured**, Wilmington Trust's actions cannot satisfy the definition of a **Wrongful Act**.  The Insuring Clause (A)(i) also provides coverage "for a **Wrongful Act** by the **Insured** [ISCO], or by any natural person for whose **Wrongful Acts** the **Insured** is legally liable . . . ."  (Def.'s Mot. Dismiss Ex. E, at 44).  Thus, the language in Insuring Clause (A)(i) appears to expand the definition of **Wrongful Act** to include "any natural person for whose **Wrongful Acts** the **Insured** is legally liable . . . ." (Def.'s Mot. Dismiss Ex. E, at 44).  As the Complaint indicates Wilmington Trust is not a "natural person", however, Wilmington Trust's actions cannot satisfy the definition of a **Wrongful Act** under Insuring Clause (A)(i).  (Compl. ¶¶ 1, 20)

Next, ISCO asserts when Wilmington Trust invoked the indemnification provision of the Trust Agreement that was "functionally a 'Claim' for monetary relief against ISCO, as Wilmington Trust demanded that ISCO step into its shoes and provide a defense and indemnity against the Underlying Lawsuit."  (Pl.'s Resp. 20).  ISCO contends this "contractual assumption of liability— that is, an indemnity—is as a matter of insurance custom and practice typically insured under Fiduciary Liability Policies" and that ISCO as the indemnitor essentially steps into the shoes of Wilmington Trust, the indemnitee, and the claim against Wilmington Trust indirectly becomes a Claim against ISCO.  (Pl.'s Resp. 20-21 (citing Compl. ¶ 38)).  Federal replies that ISCO seeks "an untenable extension of the Policy, as it unilaterally extends the insurance contract between Federal and ISCO to a contract among Federal, ISCO, and any entity ISCO contracts with."  (Def.'s

Reply 10-11).  Federal suggests further that ISCO's argument essentially rewrites Insuring Clause (A) to create coverage where none exists.  (Def.'s Reply 11).

ISCO has not identified anything within the four corners of the Policy that substantiates its claim that Wilmington Trust's demand that ISCO step into its shoes converts the Underlying Lawsuit into a lawsuit against ISCO.  Further, as the Complaint alleges Wilmington Trust's written demand for indemnification under the Trust Agreement arises out of the Underlying Lawsuit brought against Wilmington Trust, the **Loss** is not "on account of a **Claim** first made against the **Insured** [ISCO] . . . for a **Wrongful Act** by the **Insured** [ISCO], or by any natural person for whose **Wrongful Acts** the **Insured** [ISCO] is legally liable . . . ."  (Def.'s Mot. Dismiss Ex. E, at 44).  Thus, Wilmington Trust's demand for indemnification is not covered by the Policy.

### 4.    *Exclusion (E)*

Both parties also address Exclusion (E) and the exceptions therein.  In pertinent part, the Exclusions section of the Fiduciary Liability Coverage Part reads:

> The Company shall not be liable for **Loss** on account of any **Claim** or for any **Voluntary Program Notice**:
>
> . . .
>
> (E)    Assumed Liability Under Contract:
> based upon, arising from or in consequence of liability of others assumed by any **Insured** under any written or oral contract or agreement, provided that this Exclusion (E) shall not apply to **Loss** to the extent that:
> (1)    an **Insured** would have been liable in the absence of the contract or agreement; or
> (2)    the liability was assumed under the agreement or declaration of trust pursuant to which the **Plan** was established . . . .

(Def.'s Mot. Dismiss Ex. E, at 29-30).

ISCO's argument focuses on the second exception within Exclusion (E) to substantiate its claim of coverage under Insuring Clause (A).  (Pl.'s Resp. 16-24; Compl. ¶¶ 1-4, 20-38, 75-84).  Essentially, ISCO relies on the "liability of others" language in the second exception within Exclusion (E), and Tkac's preliminary determination of coverage[10] to argue the scope of the Policy's coverage under Insuring Clause (A) is not limited to **Wrongful Acts** of ISCO and "natural persons" for whose acts ISCO is "legally liable."  (Pl.'s Resp. 16-18).  ISCO reasons that if every provision of the Policy is given its full meaning, Federal's interpretation cannot be correct because it effectively reduces Exclusion (E) and its second exception to mere surplusage that have no operative effect.  (Pl.'s Resp. 21).  Alternatively, ISCO claims if the second exception within the Exclusion (E) does not restore coverage under Insuring Clause (A)(i) then the exclusion and exception are rendered meaningless and without any operative effect and there is a latent ambiguity in terms of how the Policy applies in these circumstances.[11]  (Pl.'s Resp. 16-23).

Federal contends that ISCO relies on the second exception to impermissibly create coverage beyond what is available under Insuring Clause (A)(i).  (Def.'s Mot. 7, 8; Def.'s Reply 11-12).  Federal explains that the second exception within Exclusion (E) restores coverage under

---

[10] Tkac's email to ISCO's insurance broker reads, "Originally, I did not think that there was coverage for the matter because it was a liability assumed under contract but there is a carve back on the exclusion where the indemnification arises out of the original formation of the ESOP." (Def.'s Mot. Dismiss Ex. C, at 3, DN 13-5). But Tkac's email included the following caveat: "[A] more formal letter should be forthcoming in the near future.  In the meantime, Federal reserves all rights under the Policy and at law."  (Def.'s Mot. Dismiss Ex. C, at 3).  Thus, ISCO's reliance on Tkac's email is misplaced.

[11] ISCO maintains that Federal's current position—coverage was not triggered by Wilmington Trust's indemnification claim against ISCO—violates the fundamental tenets of Kentucky law on interpreting insurance contracts, because Federal interprets and applies the provisions of Insuring Clause (A)(i) in a vacuum, rendering Exclusion (E) and the second exception therein meaningless and without any operative effect, instead of reading Insuring Clause (A) in the context of the Policy as a whole.  (Pl.'s Resp. 18-20).  To the contrary, the Court finds that Federal's interpretation of Insuring Clause (A)(i), Exclusion (E), and the second exception interprets and applies the provisions in the context of the Policy as a whole.

Insuring Clause (A)(i) for "a **Wrongful Act** . . . by any natural person for whose **Wrongful Acts** the **Insured** is legally liable."  (Def.'s Reply 11-12 (quoting Def.'s Mot. Dismiss Ex. E, at 44)). Federal asserts because Wilmington Trust is not a "natural person," coverage was never available for ISCO's obligations to Wilmington Trust and could not have been restored by the exception to Exclusion (E).  (Def.'s Reply 11-12).

As explained above, a plain reading of Insuring Clause (A)(i) indicates coverage is only available for a **Loss** (award, settlement, defense costs) on account of a **Claim** (written demand or lawsuit) first made against the **Insured** (ISCO) for a **Wrongful Act** (breach fiduciary duty under ERISA) by the **Insured** (ISCO), or by any natural person for whose **Wrongful Acts** the **Insured** (ISCO) is legally liable.  (Def.'s Mot. Dismiss Ex. E, at 44).  Exclusion (E) eliminates coverage under Insuring Clause (A)(i) when the **Insured** (ISCO) assumed the legal liability for the **Wrongful Acts** of others pursuant to a written or oral contract.  The second exception to Exclusion (E) restores coverage already granted in Insuring Clause (A)(i) when the **Insured** assumed the liability for the **Wrongful Acts** of others under the agreement or declaration of trust pursuant to which the **Plan** was established.  The term "others" in the second exception must refer to "any natural person" in Insuring Clause (A)(i) because, under Kentucky law, an exception to an exclusion does not expand the scope of coverage, rather the exception merely restores coverage already granted in the insuring agreement.  *See Kemper Nat'l Ins. Cos.*, 82 S.W.3d at 873; *see also Martin Res. Mgmt. Corp.*, 2021 WL 4269565, at *5 ("Martin is first required to establish that a Fiduciary Claim against it is covered under the Insuring Clause.  But by attempting to invoke an exception to an exclusion, when Martin has not established coverage under the Policy, Martin seeks to bypass the step of meeting its burden to establish coverage.  Martin has failed to satisfy its burden under Texas law to establish a right to coverage for the demands under the Policy.

Accordingly, we affirm dismissal of the breach of contract claim." (internal citation omitted)).  As the Complaint indicates Wilmington Trust is not a "natural person" (Compl. ¶¶ 1, 20), the second exception to Exclusion (E) does not substantiate ISCO's coverage argument.  This interpretation and application of Insuring Clause (A)(i) does not render Exclusion (E) and the second exception meaningless.  Instead, it confirms that the second exception to Exclusion (E) restores coverage already granted in Insuring Clause (A)(i) when the **Insured** (ISCO) assumed the liability for the **Wrongful Acts** of a natural person under the agreement or declaration of trust pursuant to which the **Plan** was established.

The reasonable expectation doctrine directs that insurance policy language will be interpreted as laypersons would understand it and applies only to policies with ambiguous terms, such as when a policy is susceptible to two or more reasonable interpretations. *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003).  But application of the doctrine requires the existence of actual ambiguities, not strained ones produced by a party attempting to muddy the water.  *Id.*  In this instance, there is no ambiguity; thus, the reasonable expectation doctrine does not apply.

For the reasons set forth above, Count III of the Complaint cannot survive a Rule 12(b)(6) motion as it fails to state a claim upon which relief can be granted.

**B.      Estoppel (Count I)**

Federal's primary argument is that Count I does not state a claim upon which relief can be granted because ISCO fails to establish prejudice or detriment, without which there can be no estoppel.  (Def.'s Mot. 14-17 (citing *Cincinnati Ins. Co. v. Vance*, 730 S.W.2d 521, 523 (Ky. 1987))).  ISCO responds that the Complaint plausibly alleges the elements of prejudice and detriment by citing the restrictions Federal imposed on ISCO's right to control and manage the Underlying Lawsuit, and ISCO's decision to repurchase certain shares of ISCO stock and forgive

16

an obligation of the ISCO ESOP.  (Pl.'s Resp. 12-14 (citing Compl. ¶¶ 43, 45, 46, 49))."Under Kentucky law, '[a] contract of insurance cannot be created or enlarged by estoppel . . . .'" *Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 455, 463 (W.D. Ky. 2007) (quoting *Old Republic Ins. Co. v. Begley*, 314 S.W.2d 552, 557 (Ky. 1958)).  This is because the function of "estoppel is not to work a positive gain to a party, and it does not create a new right or give a cause of action; rather, it serves to prevent losses otherwise inescapable." *Morgan v. Md. Cas. Co.*, 458 S.W.2d 789, 790-91 (Ky. 1970) (citation omitted).  "'Estoppel . . . defeats inequitable conduct.  It offsets misleading conduct, acts, or representations which have induced a person to rely thereon to change his position to his detriment.'" *Edmondson v. Pa. Nat'l Mut. Cas. Ins. Co.*, 781 S.W.2d 753, 755 (Ky. 1989) (citation omitted).  The elements of estoppel are:

> (1) [c]onduct, including acts, language and silence, amounting to a representation or concealment of material facts; (2) the estopped party is aware of these facts; (3) these facts are unknown to the other party; (4) the estopped party must act with the intention or expectation his conduct will be acted upon; and (5) the other party in fact relied upon this conduct to his detriment.

*Howard v. Motorists Mut. Ins. Co.*, 955 S.W.2d 525, 527 (Ky. 1997) (quoting *Gary v. Jackson Purchase Credit Ass'n*, 691 S.W.2d 904, 906 (Ky. App. 1985)).

"As a general rule when an insurer undertakes to defend an insured with knowledge that the policy does not make it liable for any loss, the insurer is estopped to deny liability."  *Hood v. Coldway Carriers, Inc.*, 405 S.W.2d 672, 673 (Ky. 1965) (citations omitted).  As Kentucky's highest court has noted:

> One of the basic elements of an estoppel is that the person claiming it must have been prejudiced by the action of the person against whom it is asserted.  Generally the courts hold that where an insurance company undertakes the defense of an accident case, the loss of the right by the insured to control and manage the case is itself a prejudice.

*Am. Cas. Co. of Reading, Pa. v. Shely*, 234 S.W.2d 303, 305 (Ky. 1950); *see also Hood*, 405 S.W.2d at 673 (same).

Both parties have cited *Shely* and *Hood* in support of their respective positions.  In *Shely*, American Casualty Company ("American") issued to the Shely Construction Company ("Shely"), a comprehensive liability insurance policy for the period April 1, 1947, to April 1, 1948.  *Shely*, 234 S.W.2d at 303.  Shely subsequently entered into an agreement with Louisville Gas and Electric Company ("LG & E") to construct an underground conduit system on the west side of Sixth Street, between Walnut and Broadway, in Louisville, Kentucky.  *Id.*  The construction work was completed on June 1, 1947.  *Id.*  On September 12, 1947, during a rainstorm, a tree on Sixth Street near Broadway blew over, falling on an automobile operated by Joseph F. Steinmetz, killing Steinmetz.  *Id.*

On February 20, 1948, actions were filed in the Jefferson Circuit Court to recover for the death of Steinmetz.  *Id.*  Defendants in the actions were Shely, LG & E, and the City of Louisville. *Id.*  The petitions in each case alleged that the defendants were negligent in causing or allowing the roots of the tree to be cut while constructing and digging a ditch along the street, thereby causing the tree to be in a weakened and dangerous condition.  *Id.*  Upon receiving notice of the actions brought against Shely, American referred defense of the actions to its counsel in Louisville, who proceeded to investigate the case.  *Id.*  American's counsel made an investigation, beginning on February 26, 1948 and continuing off and on until November 21, 1949, the date the suits were settled.  *Id.*  Meanwhile, counsel defended Shely in the two cases.  *Id.* at 303-04.

In December 1948, American notified Shely that its policy did not cover the actions.  *Id.* at 304.  On January 31, 1949, American provided written notice, by registered mail, to Shely indicating the suits were not covered under the insurance policy, and that any action by American

in defense of the suits prior to and after the notice was in full reservation of all rights under the policy. *Id.* On February 7, 1949, counsel for Shely wrote American's counsel advising that since American had undertaken the defense of the two lawsuits without prior notice to Shely of its disclaimer of liability, American was precluded on the grounds of waiver and estoppel from thereafter avoiding liability under the policy. *Id.*

Following settlement of the two suits, and by agreement of the parties, American brought a declaratory judgment action in the Fayette Circuit Court, which held the policy covered the accident and that American was estopped from denying coverage. *Id.* at 304. On appeal, the appellate court did not reach the issue of coverage, but affirmed the trial court's judgment on the issue of estoppel. *Id.* at 304-05. Specifically, the court concluded American was estopped from denying coverage under the policy because American "had control of the investigation and defense and did not raise any question as to noncoverage or make any reservation of rights for almost a year." *Id.* at 305.

In the *Hood* case, Hood leased certain tractors and trailers to Coldway Carriers, Inc. ("Coldway") for use in the fulfilment of Coldway's hauling contract with Pillsbury Mills, Inc., in Pennsylvania. *Hood*, 405 S.W.2d at 673. Under the leasing agreement, Hood also furnished drivers for the tractors. *Id.* One of the leased vehicles, driven by a Hood employee, injured Geiger in Pennsylvania. *Id.* At the time, Coldway was insured by American Fidelity Casualty Company ("American"). *Id.* When Geiger sued Hood, attorneys for American appeared and defended Hood in the Pennsylvania lawsuit. *Id.* After obtaining a judgment against Hood in the Pennsylvania lawsuit, Geiger brought an action in Kentucky to enforce the foreign judgment against Hood. *Id.* at 672. Hood brought third-party claims against Coldway and American seeking indemnity under

Coldway's policy with American and alleging that American was estopped from denying liability because it had defended the Pennsylvania suit. *Id.*

In the Kentucky action, American admitted that the vehicle involved in the accident with Geiger was covered under its policy with Coldway. *Id.* at 673. American argued that Hood, the owner of the leased vehicle, was not covered under the policy because of a provision expressly excluding coverage for the "owner, lessor or driver of the hired vehicle or vehicles." *Id.* The lower court sustained American's and Coldway's motion for summary judgment on the ground that America's policy did not cover Hood. *Id.*

On appeal, the court articulated the dispositive question as "whether American is precluded from asserting that Hood was not covered by the policy since it had defended the suit against him without first securing a reservation of rights." *Id.* The court recognized, "[a]s a general rule when an insurer undertakes to defend an insured with knowledge that the policy does not make it liable for any loss, the insurer is estopped to deny liability." *Id.* (citations omitted). American contended since Hood did not know of the suit in Pennsylvania, he would not have defended it; therefore, Hood was not prejudiced by American representing him in Pennsylvania and the doctrine of estoppel could not be invoked. *Id.* The appellate court responded by pointing out that the "loss of a right to control and manage one's own case is itself a prejudice." *Id.* (quoting *Shely*, 234 S.W.2d at 305) (cleaned up). Moreover, the *Hood* court explained:

> [W]hen American defended the Pennsylvania suit it knew the circumstances that gave rise to the accident as well as the provision of its policy upon which it could have denied liability. Hence we conclude that, having defended the suit against Hood without obtaining a reservation of its rights, American will not be permitted to deny liability for the judgment against Hood either under the doctrine of estoppel or waiver.

*Id.* (citations omitted).

Notably, American also contended that "while a defense of forfeiture may be lost by application of the doctrine of estoppel or waiver, it may not be invoked to extend coverage in the instant case to the owner of a leased vehicle." *Id.* The *Hood* court responded: "This Court has previously held that the defense of non-coverage may be lost by the insurance carrier under facts similar to those appearing here. . . We have decided to adhere to the principle of law set forth in the *Shely* case." *Id.* at 673-74 (citations omitted). The *Hood* court reversed the judgment and remanded the case to the trial court with instructions to overrule the motion for summary judgment. *Id.* at 674.

As mentioned above, ISCO contends "Kentucky law is well established that '[e]stoppel . . . may be used even to extend coverage past the terms of the policy.'" (Pl.'s Resp. 8 (citing *Wellington Place*, 2014 WL 97395, at *4)). But ISCO relies on dicta interpreting the *Hood* holding in an unpublished opinion by Kentucky's intermediate appellate court. *See Wellington Place*, 2014 WL 97395, at *3-4. Only holdings in published opinions are binding precedent, not dicta. *Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019); *Harp v. Commonwealth*, 266 S.W.3d 813, 820 n.18 (Ky. 2008). Moreover, the dicta in *Wellington Place* merely recognized that *Hood*'s holding—the insurer was estopped from asserting the defense of noncoverage—had the practical effect of expanding coverage under the policy to include Hood. *Wellington Place*, 2014 WL 97395, at *3-4. Thus, while the dicta may be insightful, it does not constitute well established Kentucky law.

ISCO also claims that an Indiana appellate court analyzing Kentucky law rejected Federal's contention that a contract of insurance cannot be enlarged by estoppel or waiver relying on *Hood* and *Shely*. (Pl.'s Resp. 8 n.2 (quoting *Empire Fire & Marine Ins. Co.*, 919 N.E.2d at 597 n.34)). The relevant part of the footnote is simply dicta recognizing that the holdings in *Hood* and Shely

21

had the practical effect of expanding coverage under the policy. *Empire Fire*, 919 N.E.2d at 597 n.34 (citing *Hood*, 405 S.W.2d at 673; *Shely*, 234 S.W.2d at 304)). While the dicta may be perceptive, it is not controlling or instructive.

ISCO argues that the Complaint plausibly alleges the element of prejudice and detriment by asserting that Federal "restricted" ISCO's right to control and manage the defense in the Underlying Lawsuit. Specifically, the Complaint alleges Federal imposed certain conditions—receipt of a budget from Wilmington's choice of defense counsel and an opportunity to review the Joint Defense agreement between Wilmington Trust and ISCO—before Federal agreed to Wilmington Trust's choice of defense counsel. (Pl.'s Resp. 13-14 (citing Compl. ¶¶ 43, 45)). ISCO emphasizes although Federal consented to Wilmington Trust's choice of defense counsel, Federal had the discretion to reject Wilmington Trust's choice. (Pl.'s Resp. 13-14). ISCO also stresses due to its indemnity obligations to Wilmington Trust (Compl. ¶ 27), and ISCO's participation in the litigation evidenced by the Joint Defense Agreement (Compl. ¶ 45), "ISCO plainly had a sufficient interest in the Underlying Lawsuit such that Federal's control and management of the Underlying Lawsuit constitutes prejudice to ISCO." (Pl.'s Resp. 14). In support of its position, ISCO cites the general rule articulated in *Shely*, "the loss of the right by the insured to control and manage the case is itself a prejudice." (Pl.'s Resp. 14 (quoting *Shely*, 234 S.W.2d at 305)).

In *Shely*, the insured asserted the estoppel claim. *Shely*, 234 S.W.2d at 304-05. In *Hood*, a third party asserted the estoppel claim. *Hood*, 405 S.W.2d at 673. Both cases, however, had one thing in common: the courts recognized that the party claiming estoppel must have been prejudiced by the action of the insurance company. *Shely*, 234 S.W.2d at 305; *Hood*, 405 S.W.2d at 673-74. In both cases, the insurance company undertook defense of the case and the person

claiming estoppel had been prejudiced by the loss of the right to control and manage his own case. *Shely*, 234 S.W.2d at 305; *Hood*, 405 S.W.2d at 673-74.

Here, ISCO is claiming Federal restricted ISCO's right to control and manage the Underlying Lawsuit, but the circumstances here are starkly distinguishable from those in *Shely* because Wilmington Trust was the defendant in the Underlying Lawsuit, not ISCO. Further, the defense Federal paid consisted of counsel chosen by Wilmington Trust. Given that ISCO and Wilmington Trust had a joint defense agreement, there are no factual allegations that Federal meaningfully interfered with that defense.

While the Complaint alludes to the Joint Defense agreement between Wilmington Trust and ISCO, ISCO has not cited, nor has the Court found, any allegations in the Complaint indicating Wilmington Trust assigned to ISCO the right to control or manage the defense of the Underlying Lawsuit. (Compl. ¶ 45). In fact, the Complaint makes no allegations concerning the extent of ISCO's participation in the control and management of the litigation. Thus, the Complaint's general assertions—Federal "restricted" ISCO's right to control and manage the defense in the Underlying Lawsuit—do not plausibly allege the elements of prejudice and detriment supporting ISCO's estoppel claim.

Alternatively, ISCO's contends the following portion of the Complaint plausibly alleges the elements of prejudice and detriment:

> ISCO proceeded to conduct business in reliance on Mr. Tkac's representations that coverage existed and Federal's provision of a defense to Wilmington Trust. As an example, ISCO decided to re-purchase certain shares of ISCO stock from the ISCO ESOP. In making this decision, the fact that Federal had confirmed coverage for the Underlying Lawsuit was expressly factored into the pricing of that re-purchase transaction. ISCO also forgave certain obligations of the ESOP in reliance on Federal's representations that it would provide coverage for the Underlying Lawsuit.

(Compl. ¶ 49). ISCO has not cited any authority supporting its assertion that such business decisions satisfy the prejudice element of estoppel. Nor can ISCO make such a showing because, as mentioned above, the person claiming estoppel must have been prejudiced by the action of the person against whom it is asserted. *Shely*, 234 S.W.2d at 305; *Hood*, 405 S.W.2d at 673-74. The above-quoted allegations in the Complaint indicate ISCO was prejudiced by its own deliberative choices. ISCO provides no explanation how Federal's agreement to pay Wilmington Trust's defense costs, while reserving its rights to deny coverage, induced ISCO's business decisions—presumably made while Wilmington Trust's motion to dismiss the underlying suit was pending.[12] Thus, it does not plausibly allege the elements of prejudice and detriment as to ISCO's estoppel claim.

In sum, Count I of the Complaint does not state a claim upon which relief can be granted because ISCO fails plausibly to allege the element of prejudice or detriment. For this reason, the Court need not address the remaining arguments of the parties, including ISCO's contention that Federal undertook the defense of Wilmington Trust in the Underlying Action, despite knowing the circumstances giving rise to the underlying lawsuit as well as the basis for asserting no coverage under the Policy.

### C.    Waiver (Count II)

Waiver and estoppel are terms often misused interchangeably despite the clear distinction between them. *Edmondson v. Pa. Nat'l Mut. Cas. Ins. Co.*, 781 S.W.2d 753, 755 (Ky. 1989).

Waiver is bottomed on a voluntary and intentional relinquishment of a known, existing right or power under the terms of an insurance contract. It is the expression of an intent not to insist upon what the law affords. The intention may be inferred

---

[12] ISCO does not specify when it repurchased stock from the ISCO ESOP and forgave certain ESOP obligations, though it would seem odd to do so before the trial court ruled on Wilmington Trust's motion to dismiss. (Compl ¶¶ 7, 49).

24

       from conduct and knowledge and may be actual or constructive, but both intent and knowledge are essential elements of waiver . . . .

*Id.* (citation omitted).  "[I]t is textbook law that a waiver must be intentional."  *Id.* at 756; *see also Smith v. Allstate Ins. Co.*, 403 F.3d 401, 406-07 (6th Cir. 2005) (under Kentucky law, the waiver must be intentional).  By contrast, estoppel "gives no effect to a presumed intention, but defeats inequitable conduct.  It offsets misleading conduct, acts, or representations which have induced a person entitled to rely thereon to change his position to his detriment."  *Edmonson*, 781 S.W.2d at 755.

       Count II of the Complaint asserts:  "In the insurance context, the doctrine of waiver precludes an insurer from asserting a defense of non-coverage where the insurer acknowledges coverage and provides a defense but fails to reserve its right to later assert a defense of non-coverage."  (Compl. ¶ 68).  Count II further alleges Federal waived its right to assert a defense of noncoverage because Federal acknowledged coverage in Tkac's March 9, 2017, email and then defended Wilmington Trust in the Underlying Lawsuit for more than a year without any reservation of its rights to assert noncoverage.  (Compl. ¶¶ 69-74).

       Both the Complaint and record indicate that Federal twice reserved its rights before agreeing to pay Wilmington Trust's defense costs.  The first time is Federal's January 31, 2017, letter acknowledging ISCO's tender of the Underlying Lawsuit for a determination of coverage under the Policy and advising that Tkac would handle the matter on behalf of Federal.  (Compl. ¶ 40; Def.'s Mot. Dismiss Ex. B, at 2).  The letter expressly stated that "[in] the meantime, [Federal] reserves the right to raise all applicable defenses available under the policy and at law."  (Compl. ¶ 40; Def.'s Mot. Dismiss Ex. B, at 2).

       In a February 13, 2017, email from Tkac to ISCO's broker, Schneider, Federal reserved rights a second time.  (Compl. ¶ 41; Def.'s Mot. Dismiss Ex. C, at 2-3).  The email is particularly

relevant to Count II because Tkac advises that "**the preliminary review** of coverage is *positive in terms of defending the matter*" and that "a more formal letter should be forthcoming". (Compl. ¶ 41; Def.'s Mot. Dismiss Ex. C, at 2-3 (emphasis added)). Equally important, the email explicitly states: "In the meantime, Federal reserves all rights under the Policy and at law." (Compl. ¶ 41; Def.'s Mot. Dismiss Ex. C, at 2-3). This email is significant because Tkac advised Schneider that Federal would be providing a defense under reservation of rights.

Notably, the February 13, 2017, email is the first of three emails in an email chain between Tkac and Schneider attached as an exhibit in support of Federal's motion to dismiss. (Def.'s Mot. Dismiss Ex. C, at 2-3). The second email, dated March 8, 2017, is from Schneider to Tkac and in a follow-up to Tkac's February 13, 2017, email. (Def.'s Mot. Dismiss Ex. C, at 2). The email reads: "It occurs to me I do not believe I ever received any sort of formal letter stating that *the defense* would be covered by Chubb. Was the letter ever submitted? Could you forward a copy to me?"[13] (Def.'s Mot. Dismiss Ex. C, at 2 (emphasis added)).

The third email, dated March 9, 2017, is Tkac's response to Schneider. (Def.'s Mot. Dismiss Ex. C, at 2). The email reads:

> I took a look at the file. There is coverage for the matter and I have been working with the Insured and Wilmington Trust. We normally get our coverage letters out

---

[13] Although the second email is not mentioned in the Complaint, parts of the February 13, and March 9, 2017, emails in this email chain are referenced and quoted verbatim in the Complaint and are central to the waiver claim in Count II. (Compl. ¶¶ 41, 46, 69, 71). Federal attached a full and complete copy of the email chain as an exhibit to its motion to dismiss. (Def.'s Mot. Dismiss Ex. C, at 2). Plaintiff has not challenged the exhibit's authenticity or argued the second email cannot be considered without converting the Rule 12(b)(6) motion to one for summary judgment. Additionally, Schneider's March 8, 2017, email is integral to ISCO's waiver claim in Count II because it provides context necessary to understand Tkac's responsive email on March 9, 2017. (Def.'s Mot. Dismiss Ex. C, at 2). Accordingly, the Court may consider this March 8, 2017, email without converting the Rule 12(b)(6) motion to one for summary judgment. *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (exhibits attached to a motion to dismiss that are referred to in the complaint and are central to the claims contained therein may be considered without converting the motion to one for summary judgment).

> within a 45 day time frame from the date of submission.  I will try to make that timeframe and hope to get the letter out next week.  Since I will be traveling, it may carry over to the week of the 20th but should not be longer than that.  If any excess carriers have questions, please direct them to me.

(Def.'s Mot. Dismiss Ex. C, at 2).  When read in context with the two preceding emails, Tkac's response merely confirms Schneider's inquiry that Federal **would be providing a defense** under reservation of rights.  Thus, Tkac's March 9, 2017, email response does not substantiate a claim that Federal voluntarily and intentionally relinquished its contractual right to deny indemnity coverage.  As previously mentioned, "it is textbook law that a waiver must be intentional." *Edmondson*, 781 S.W.2d at 756.

Notably, ISCO's waiver claim depends in part on assertions about Tkac and Federal working with Wilmington Trust to select and approve defense counsel and coordinate the defense of Wilmington Trust as well as the passage of one year before Federal issued its denial of coverage on March 28, 2018.  (Compl. ¶¶ 70-73).  These assertions have no bearing on the question of whether Federal intentionally waived its contractual right to deny indemnity coverage under the Policy.  Having explicitly reserved its rights twice to deny coverage, Federal's failure to reiterate that reservation a third time in response to an inquiry regarding providing a defense for the underlying suit cannot support a claim of waiver by Federal.

For the above reasons, ISCO cannot establish the elements of waiver and Count II of the Complaint will be dismissed.

### D.     Counts IV (Bad Faith-Violation of KUCSPA) and V (Bad Faith-Common Law)

Federal argues because ISCO cannot, as a matter of law, establish a right to coverage under the Policy, ISCO's extra-contractual claims in Counts IV and V must also fail as a matter of law

and should be dismissed for failure to state a claim for which relief can be granted.  (Def.'s Mot. 18-20) (citing *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000))).

Under Kentucky law, an insured must prove three elements in order to present a prima facie claim for bad faith:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (citation omitted).  Kentucky courts routinely dismiss bad faith claims where, as here, the insurer has no obligation to pay the claim under the policy, as required by the first prong of the *Wittmer* test.  *See Ky. Nat'l Ins. Co. v. Shaffer*, 155 S.W.3d 738, 742 (Ky. App. 2004) ("[T]here being no contractual obligation to pay under the present policy, we conclude as a matter of law that [the insured] could not maintain an action for bad faith against [the] [insurer]."); *Wolz v. Auto Club Prop.-Cas. Ins. Co.*, No. 3:15-CV-00638-TBR, 2017 WL 1240766, at *5 (W.D. Ky. Mar. 31, 2017) (dismissing the bad faith claim because the plaintiff could not satisfy the first prong under *Wittmer*); *Harnish v. Safe Auto Ins. Co.*, No. 03-183, 2005 WL 1868785, at *7 (E.D. Ky. July 26, 2005) (dismissing the bad faith claim because the plaintiff did not have coverage, which is a prerequisite to a bad faith claim).

For the reasons set forth above, ISCO has not stated claims for breach of contract, estoppel, or waiver, and thus cannot state a claim for bad faith under KUCSPA or Kentucky common law. Therefore, Counts IV and V of the Complaint will be dismissed.

## V.     CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.     Defendant's Motion to Dismiss (DN 13) is **GRANTED**, and Plaintiff's claims of estoppel, waiver, breach of contract, bad faith in violation of KUSCPA, and bad faith under Kentucky common law are **DISMISSED WITH PREJUDICE**.

2.     Defendant's Motion for Leave to File Supplemental Authority (DN 31) is **DENIED**.

3.     The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

February 28, 2022

cc:     counsel of record